Nellie M. Carpenter,
Et Als., Appts.
vs.
Benjamin S. Carpenter,
Executor, Appellee

A. O. T. C. No. 62

March 27, 1928

SUMNER, J. This is an appeal from the probate of the will of Wanton R. Carpenter. The jury returned a verdict against the alleged will and proponents filed their motion for a new trial on the usual grounds. Affidavits and counter-affidavits were also filed, mostly on the coloring and chemical constituents of ink. Counsel have submitted full briefs and transcripts of much of the testimony.

The claims of unsoundness of mind and undue influence are not substantiated. The only debatable question in the mind of the Court is as to due execution of the will. Arthur W. Stedman testified t h at decedent brought the paper into his store already signed by the decedent and by Joseph B. Nichols as a witness, and that he (Stedman) then added his signature in the absence of Nichols. Nichols testified that the paper was properly signed by all the parties in Stedman's store and Judge Nathan B. Lewis corroborated him. Nichols' testimony was circumstantial and favorably impressed the Court. He contradicted his testimony given at previous trials on some of the details and it also appeared that in the Probate Court he failed to remember any facts of the execution. However, he has never denied the facts stated in the attestation clause and he claims that after hearing Judge Lewis' testimony and talking with him, his memory was refreshed. Judge Lewis having deceased,

his testimony was read from a transcript of the testimony at a previous trial in November 1923. He was then 81 years old and was about 75 at the time of the execution of the will in 1917. He appeared from the transcript to be alert and bright and gave his testimony with full detail. He said he had been drawing wills since 1872. that he drew this will, attended to its execution and wrote the day of the month, viz, "Ninth", in the testimonium clause.

Joseph T. Northup testified that on the morning of the execution of the will he saw the witness Nichols in front of Stedman's store, and Judge Lewis and Wanton R. Carpenter, the decedent, apparently going into it.

The opponents of the will introduced a transcript of the testimony of Charles H. Caswell and Mrs. Grace Walker, employed in Stedman's store, given at a previous trial. Caswell testified that he saw Carpenter and Stedman go into the latter's office on a day (the date of which he can not fix within four years); that later he saw Carpenter go out, and that Stedman then came to where he was standing and told him that Carpenter had made a will; that he did not see Judge Lewis or Mr. Nichols there at that time. Mrs. Walker testified that there was ill feeling between Stedman and Nichols and that Nichols did not come into the office in the period from 1915 to 1918; that she never saw Lewis, Carpenter, Nichols and Stedman there together during that time. Mr. Caswell and Mrs. Walker were employed with several others in a prosperous market and this episode happened on a July morning at the busiest hour of the day. It would not be at all strange if Nichols and Lewis were there and these two witnesses did not see them. Mr. Stedman, then 49 years old, had conducted a business for 22 years and apparently a successful one, with a bookkeeper, a meat cutter and at least two other clerks. He had been postmaster at Wakefield for 16 years and must have signed hundreds of papers, and probably witnessed some wills, and yet he says that when Carpenter presented that will to him, he did not look to see what he was signing. He said he noticed the difference of the writing (meaning the attestation clause) under the testator's signature but he did not read it; yet he knew exactly where to sign. When asked how he knew where to sign, he said common sense or natural instinct told him, yet he claims to have never signed a will before and could not explain what he meant by common sense. It is a familiar experience with lawyers that laymen witnessing a will are usually at a loss where to sign. If not instructed by someone, they are apt to sign directly under or directly opposite the testator's name, sometimes on the margin, sometimes at the bottom of the page; never in the right place unless they have had some previous experience. Stedman's testimony varies in the different trials as to whether he gave any attention to the attestation clause. In this trial he said he gave it no thought. In a former trial he said he knew it was some sort of a record of what he had done. At former trials he made some inadvertent statements that seem to bear upon his veracity. Once he said, "I supposed we used the one (pen) that was on the desk", and his labored explanation of this lapse was evident. At another time he used the expression "whatever the day is when we were all together". When asked to explain that statement, he said, "I don't know what I meant by it." He admitted that he may have stated to Arthur Carpenter that if he had known what the contents of the will were in regard to young Wanton Carpenter, he would never save signed it, and that he did not think the widow of decedent had been treated right.

It seems incredible that Judge Lewis, with his experience, would have allowed Carpenter, a layman, to take that paper away and have it signed in his absence, and then after all the names had been attached, come into court and swear that he attended to its execution and describe the details of it as fully as he did. If Carpenter had gone off without his knowledge and had the will executed, Judge Lewis would hardly have felt that he was called upon to perjure himself in order to save his reputation or protect Carpenter. And, again, who but Lewis would have thought to write in "Ninth"? And he would not be apt to do it before the execution. It is improbable that either Carpenter or Nichols or Stedman filled in the word "Ninth". The Court does not believe that Mr. Stedman told the truth.

Both sides presented the testimony of handwriting experts who drew favorable inferences for the sides which they represented. Their experienced eyes saw conditions which were not visible to the Court and probably not to the jury. Mr. Osborn and Mr. Clark for the proponents and Mr. Hartkorn for the opponents commended themselves to the Court as fair and honest. Mr. Turner, presented by the opponents, was manifestly partisan and drew some improbable conclusions in which he was not supported by Mr. Hartkorn. Among other things, he said that the name Stedman was written about ten days after the name Nichols, with the statement that it took many days for the ink to dry. Mr. Hartkorn, associated with him for the opponents, said that Stedman's name was written in from six to twenty minutes after the name Nichols was written. He also said that it was possible that Nichols' name was blotted, and if it were blotted then it would dry quicker. It is the experience of the Court that commercial ink ordinarily dries in from one to two min-

utes, and if the stroke is broad it takes a somewhat longer time.

The experts for the opponents claimed that the signatures of the witnesses were written with different inks; also that two different pens were used, and that Stedman's name was not written until Nichols' was dried. The experts for the proponents said that the two signatures were written with the same pen and ink, that the color of the ink used by Nichols was different because it had been blotted and that Nichols' signature was not dry when Stedman signed. It is difficult for the Court or jury to decide when experts disagree.

There was testimony that there was more than one bottle of ink in Stedman's office and presumably there were also different pens, and it is not impossible that two kinds of ink and two pens were used in the execution. One fact was brought out, clearly apparent to the layman's eye, which was significant, and that was that in beginning to write their respective names, both Nichols and Stedman made two starts. The experts for the proponents testified that in their opinion this indicated the use of the same pen or the same ink, or both. As far as the Court could observe through the glasses, the stroke where Stedman's pen intersected the signature of Nichols was not clear, but showed a blending which would tend to substantiate the claim that the ink of Nichols' signature was not thoroughly dry when Stedman signed. Mr. Turner found, as he claimed, a phenol blue in the Nichols signature and a methyline blue in the Stedman signature, and the affidavits had to do with the existence or non-existence of such colors as phenol blue and methyline blue.

The Court believes that the verdict is not supported by the evidence. There was considerable difficulty in securing a jury. Some of the prospective jurors were evidently anxious to serve

and after their rejection seemed to associate themselves with one side or the other. The Court was not impressed with the jury as finally secured.

Proponents' motion for a new trial granted.

For appellants: James O. Watts, Henshaw, Lindemuth and Baker.

For appellees: Tillinghast & Collins, Samuel H. Davis.